Electronically Filed
Intermediate Court of Appeals
30332
31-OCT-2013
09:00 AM

NO. 30332

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
JOEL C. ALLEN, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 08-1-1143)


MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Leonard and Ginoza, JJ.)

Defendant-Appellant Joel C. Allen (**Allen**) appeals from a January 27, 2010, Circuit Court of the First Circuit (**Circuit Court**) Judgment of Conviction and Sentence for Murder in the Second Degree,[1] in violation of Hawaii Revised Statutes (**HRS**) § 707-701.5 (1993).[2]

I.   RELEVANT FACTS

A.   Pretrial Inquiry Into Penal Responsibility

On July 22, 2008, Plaintiff-Appellee State of Hawai'i (**State**) obtained an indictment against Allen for murder in the second degree.  The charge arose out of an incident in which Allen caused the death of Jason Namauu (**Namauu**) by

---

[1]   Except as otherwise noted, the Honorable Michael A. Town presided.

[2]   HRS § 707-701.5 states the following:

(1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

stabbing/slashing him twenty times using a knife with a three-and-one-half inch blade.

On March 3, 2009, the State filed a Motion for Mental Examination of Defendant to Determine Penal Responsibility and Fitness to Proceed, which was granted. During June and July of 2009, three doctors (John L. Wingert, PhD (**Dr. Wingert**); Dennis R. Donovan, PhD, ABPP, CSAC (**Dr. Donovan**); and Martin Blinder, MD (**Dr. Blinder**)) each submitted a letter to the court regarding Allen's penal responsibility and fitness to proceed. All three independent diagnoses concluded that Allen was fit to proceed and opined that penal responsibility should not be negated in this case. On September 1, 2009, a hearing on Allen's fitness to proceed was held, and the court ultimately found Allen fit to proceed.[3]

On November 2, 2009, Allen filed a Motion to Strike Three Panel and Appoint Three Qualified Examiners or Dismiss (**Motion to Strike Examiners**), arguing that the reports denied him an affirmative insanity defense because they did not sufficiently render an opinion regarding penal responsibility because they failed to adhere to the requirements of HRS § 704.[4] The court subsequently denied the motion, concluding that any discrepancy "goes to the weight and not the admissibility of the doctors."

B. Voir Dire

Jury selection took place from November 9-10, 2009. During jury selection, Allen's counsel was precluded from asking potential jurors certain questions regarding possible racial prejudices. The Circuit Court, after a discussion at the bench, cautioned Allen's counsel against particularized questioning regarding race, stating: "Counsel, the court's given an instruction earlier that everyone must be treated without bias, prejudice or favoritism on the grounds of race, sexual

---

[3]   The Honorable Michael D. Wilson presided over the proceedings related to Allen's mental fitness.

[4]   HRS § 704 is entitled "Penal Responsibility and Fitness to Proceed." Its subsections set forth the elements of the insanity defense (§ 704-400), the required procedures and content for the reports (§ 704-404), the form of experts' testimony (§ 704-410), as well as several related topics.

orientation, gender, religion, and you can inquire into that if you wish. But other than that, let's move on." Allen's counsel also requested additional peremptory challenges based on the Circuit Court's refusal to allow voir dire on potential racial prejudice; however, the court denied that request.

C.    The Jury Trial

After the jury was empaneled, the trial began on November 13, 2009. At trial, Allen, a Caucasian male, testified that he met the decedent, Namauu, who was a trans-gender Hawaiian or Hawaiian-Filipino and known to Allen as Lynette, approximately two or three weeks prior to July 17, 2008. This testimony is in conflict with the testimony of Lambert Kaleikini (**Kaleikini**), also a self-identified transvestite, who claimed that he had known Allen for over five years and Namauu since 2000, had seen Allen with Namauu at clubs and bars acting "lovey-dovey" and "intimate," and that Allen was actually in a relationship with Namauu for about two years.

Allen, on the other hand, testified that he considered Namauu an acquaintance, but he had not gone anywhere with her until July 17, 2008. On that date, Allen testified, while walking to his car in order to pick up his mail, he began talking to Namauu. He agreed to store Namauu's belongings in his car, as Namauu was homeless. Allen then let Namauu ride along with him to pick up the mail. Allen soon thereafter stopped the car at Cartwright Park to get a drink of water and use the restroom, while Namauu remained in the car. Upon returning to his car, Allen testified, he put his seatbelt on. He then allegedly saw Namauu "fidgeting with an ice pipe and a rag" and said "Is that ice? Is that drugs?" Namauu responded that "Yes, it is[,]" which prompted Allen to ask "Are you -- have you taken this today? Have you taken drugs already?" Namauu answered "yes" and asked for $250. Allen then allegedly stated that he didn't want drugs in the car and he again refused her request for money.

Allen testified that, following the exchange, he told Namauu that he was going to take her "back," and Namauu responded in a loud voice, saying "Your driving irritates me." Namauu then

purportedly struck Allen above his left eye and continued asking for money, at one point stating, "Give me the money or I'll kill you" and "You're not going until you give me the money." Allen testified that Namauu continued her assault by "clawing" at his hands and hitting him in the face, shoulders, arms, and back. He then attempted to get out of his vehicle, but could not unhook his seatbelt. Claiming fear for his life, Allen reached for a pocket knife that he kept on the driver's side door and told Namauu to stop. However, Namauu then allegedly grabbed for the knife and continued her assault, while Allen tried to fend her off.

Meanwhile, two neighbors, Herman Henry (**Henry**) and Ilanlan Asher (**Asher**) were at Cartwright Field for their wives' softball game when they heard loud shouting from a vehicle and saw someone in the driver's seat apparently punching or stabbing the passenger, who was on her back "kicking" up at the driver. Henry and Asher approached the car and saw Allen throw a knife to the car's floor and observed that the passenger was bleeding. Henry grabbed the knife and threw it out the door, while Asher tried to keep Allen in the car; however, Allen pushed the car door open and fled. Both Henry and Asher testified that Allen did not have his seat belt on at the time of the incident. Another man who was at the scene, Jonathan Bargas (**Bargas**) also testified that he never saw Allen wearing a seatbelt. When Bargas observed that Namauu was bleeding profusely from the chest, he immediately ran back to the softball field to call the police. Asher, meanwhile, went over to Namauu (on the passenger's side) to help her out of the vehicle and apply pressure to the stab wound in her chest. Henry ran after Allen, eventually flagging down some police officers and pointing them in Allen's direction.

Allen testified that, upon exiting his car, he was confused and did not want to be attacked again, so he began to run, eventually reaching Beretania Street. Allen explained that a police officer then told him to stop; he complied and went to the ground. Allen testified that he was not tripped by the

4

arresting officer; however, this is in conflict with what Officer Steven Chun (**Chun**) described, which was that he caught up to a fleeing Allen and did a "leg sweep," causing Allen to fall forward onto the concrete. Officer Chun then arrested Allen.

During Namauu's transport to Queen's Medical Center she was covered in blood, and at no point did Namauu recover consciousness or show any vital signs. Officers at the crime scene recovered several items, including: a handbag containing "two glass [drug] pipes and . . . various metal scrapers and straws," two duffle bags of men's clothes and other items in the trunk of Allen's car, and a blood-soaked seven-inch pocket knife with a three-and-one-half inch blade. One of the responding officers, Officer Noel Araki (**Araki**), testified that the front driver's side seatbelt was fastened when he arrived on scene, and another officer, Detective Theodore Coons (**Coons**) testified that the driver's side seatbelt appeared "ironed . . . into the seat."

Doctor William Goodhue (**Dr. Goodhue**) performed the autopsy, and the Circuit Court allowed him to testify as an expert in forensic pathology, over the objections of Allen's counsel. Before expounding on the case, Dr. Goodhue testified as to his qualifications as an expert, stating, among other things, that he: (1) is the Acting Chief Medical Examiner of the City and County of Honolulu; (2) has been licenced to practice medicine in Hawai'i since 1972; (3) earned his medical degree from Cornell University; (4) did his residency in anatomic pathology at the New York Hospital Cornell Medical Center; and (5) is board-certified in anatomic pathology (of which forensic pathology is a sub-speciality) by the American Board of Pathology. Additionally, Dr. Goodhue explained that he has conducted approximately 1,600 forensic autopsies and has previously been qualified to testify as a medical expert in forensic pathology in the Hawai'i state courts on about 80 previous occasions in the past eight and a half years.

On November 12, 2009, Allen's counsel made a motion to preclude Dr. Goodhue from testifying as to whether Namauu's injuries were consistent with "defensive wounds;" nevertheless,

the Circuit Court allowed the testimony at trial. In his expert testimony at trial, Dr. Goodhue explained that the stab wound to Namauu's chest was the fatal one and that the presence of methamphetamine in Namauu's body had little, if any, contribution to Namauu's ultimate demise. Goodhue also identified a number of wounds that were consistent with "defensive" wounds, including those to Namauu's legs, arm, and hand.

D. Jury Instructions, Closing Arguments and End of Trial

Over Allen's objection, the Circuit Court gave the Hawaiʻi Pattern Jury Instruction (**HAWJIC**) self-defense instruction, which states in relevant part:

> The use of deadly force upon or toward another person is justified when a person using such force reasonably believed that deadly force is immediately necessary to protect himself on the present occasion against death, serious bodily injury or kidnapping. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

Allen's counsel objected to the "immediate threat" language contained in the HAWJIC instruction.

Prior to closing arguments, Allen's counsel objected to the State's PowerPoint slide, which referred to Bargas's opinion that Allen was not acting in self-defense. The slide depicted Bargas stating, "In my opinion, no, it did not appear that defendant was acting in self-defense." The Circuit Court overruled this objection on the ground that the court would allow reference to the statement as it was the witness's perception.

During the closing argument, the State made several religious references, including the recounting of the parable of the Good Samaritan. The defense objected; however, the Circuit Court overruled the objection, saying: "Aside from religious references, I will allow it as a historical example." Allen's counsel also objected to what he felt was a misstatement of law by the State,[5] though the court overruled this objection, stating

---

[5] The State's alleged misstatement entailed the following:

Now, the defense said, well, they tried to define reasonable doubt
(continued...)

that "[t]he jury has the law" and that the prosecutor was only trying to rebut something that the defense had previously stated. Similarly, the Circuit Court overruled a defense objection based on the State allegedly implying that Allen was lying and tailoring his testimony.

The defense moved for a mistrial (or, in the alternative, to strike the allegedly improper arguments and give different jury instructions) several times near the end of the State's closing argument. The Circuit Court denied the motions for a mistrial and declined to provide any alternative relief. The jury was then allowed to deliberate, and on November 25, 2009, they returned a unanimous verdict of guilty of the charged offense of murder in the second degree.

On January 27, 2010, the Circuit Court entered a judgment of conviction against Allen for Murder in the Second Degree in violation of HRS § 707-701.5, sentencing him to life imprisonment with the possibility of parole, pursuant to HRS § 706-656 (1993 & Supp. 2012), and ordering him to pay $3,281.72 in restitution and a crime victim compensation fee of $305.00.

II.  POINTS OF ERROR

Allen raises five points of error on appeal, contending that the Circuit Court:  (1) abused its discretion in denying Defendant's Motion to Strike Examiners; (2) abused its discretion in precluding Allen's counsel from examining the venire regarding possible racial prejudice; (3) abused its discretion by allowing testimony of the medical examiner to testify as to whether some of the decedent's wounds were consistent with defensive wounds;

---

[5](...continued)
for you. And he put a number of slides there. And he said one slide and he made one representation that, well, it doesn't mean that the defendant is most likely guilty. If you find the defendant's most likely guilty, you must find him not guilty. That's not in the instructions.

The instructions read that you must find the defendant -- you must not find the defendant guilty upon mere suspicion or upon evidence which only shows that he is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but proof beyond a reasonable doubt. There is nothing about most likely guilty. But he would like you to believe that.

(4) erred by failing to properly instruct the jury regarding justifiable use of force; and (5) denied Allen's request for a mistrial on the grounds that the prosecutor's misconduct deprived Allen of a fair trial.

III. STANDARDS OF REVIEW

The appointment of a panel of examiners is reviewed under the abuse of discretion standard of review. State v. Castro, 93 Hawaiʻi 424, 425-26, 5 P.3d 414, 415-16 (2000). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Plichta, 116 Hawaiʻi 200, 214, 172 P.3d 512, 526 (2007) (citation and internal quotation marks omitted).

"Voir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. . . . This is so because the determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." State v. Altergott, 57 Haw. 492, 496-97, 559 P.2d 728, 732 (1977) (citations and internal quotation marks omitted). "[A]bsent abuse of his broad discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial judge's rulings as to the scope and content of voir dire will not be disturbed on appeal." Id. at 499-500, 559 P.2d at 734 (citation omitted).

"Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." State v. Maelega, 80 Hawaiʻi 172, 180, 907 P.2d 758, 766 (1995) (citation omitted).

In articulating the standard of review regarding jury instructions, the Hawaiʻi Supreme Court has stated the following:

> The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error

was not prejudicial. In other words, error is not to be viewed in isolation and considered purely in the abstract.

State v. Kassebeer, 118 Hawai'i 493, 504, 193 P.3d 409, 420 (2008) (citations, internal quotation marks, and brackets omitted). "[O]nce instructional error is demonstrated, [the appellate court] will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt." State v. Pond, 118 Hawai'i 452, 462, 193 P.3d 368, 378 (2008).

The Hawai'i Supreme Court has stated the following with regard to prosecutorial misconduct:

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Misconduct of a prosecutor may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial.

State v. Mainaaupo, 117 Hawai'i 235, 247-48, 178 P.3d 1, 13-14 (2008) (citations and internal quotation marks omitted).

"In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the appellate court considers] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." State v. Agrabante, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

IV. DISCUSSION

A. Allen's Penal Responsibility and Fitness to Proceed

Allen argues that the Circuit Court's denial of his Motion to Strike Examiners was an abuse of discretion and a violation of his state and federal constitutional rights. He contends that each of the three examiners failed to render an opinion as to the actual extent, if any, to which his capacity was impaired. Therefore, Allen argues, the medical reports did not allow him to properly assess whether he should present an

insanity defense, and his counsel could not properly advise him regarding penal responsibility.

HRS § 704-404(4)(d) (Supp. 2012) provides that, when a circuit court in a felony case appoints three qualified examiners to examine and report upon the physical and mental condition of a defendant, the report of the examination shall include, *inter alia*, "[a]n opinion as to the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law was impaired at the time of the conduct alleged." The penal responsibility and fitness statute also states:

> When an examiner testifies on the issue of the defendant's responsibility for conduct alleged or the issue of the defendant's capacity to have a particular state of mind which is necessary to establish an element of the offense charged, the examiner shall be permitted to make a statement as to . . . the examiner's *opinion of the extent, if any,* to which the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law or to have a particular state of mind which is necessary to establish an element of the offense charged was impaired as a result of physical or mental disease, disorder, or defect at that time.

HRS § 704-410(3) (1993) (emphasis added). Thus, we examine whether the Circuit Court abused its discretion by declining to strike and replace all three examiners based on their purported failure to comport with these statutory requirements.

Allen argues that Dr. Wingert's letter report was deficient because it failed to give an opinion about the extent to which Allen's capacity was impaired as required by HRS § 704-404(4)(d). However, in a section labeled "Penal Responsibility," Dr. Wingert's letter report states that "Mr. Allen's capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law were not substantially impaired by physical or mental disease, or defect at the time of the alleged conduct." The report also goes into rather deep and detailed analysis regarding the extent of Allen's capacity, stating observations such as him showing "no indication or endorsement of hallucinations, delusions, paranoia or other marked disturbance in [his] basic thinking or perceptual

processes" and referencing the fact that Allen "acknowledged" and could articulate what happened on the day of the incident.

Allen also asserts that Dr. Wingert only looked for "a major mental disorder that substantially impaired" Allen's capacity, and HRS § 704 "has never required that the mental disease, disorder or defect be 'major.'"  Although Dr. Wingert indeed stated that he could detect no "major" mental disorder, he also stated in plain terms the extent of Allen's capacity without the use of the "major" modifier.  Thus, it appears that Dr. Wingert's use of the term "major" was for descriptive purposes, and it does not seem that he searched for only "major" disorders.

Allen similarly asserts that Dr. Donovan's letter failed to render an opinion about the extent, if any, of his impaired capacity because, he argues, the letter simply states that "I do not have evidence to indicate that Mr. Allen's cognitive and volitional capacities were substantially impaired by reason of a mental disorder at the time of the instant offense."  However, the substance of Dr. Donovan's letter does in fact provide sufficient substance and analysis to comply with the requirements of HRS § 704-404(4)(d).  In addition to the remark quoted above, Dr. Donovan summarized Allen's clear articulation of the incident and noted that Allen denied having an impaired mental state prior to the moment he claimed Namauu attacked him. Moreover, Dr. Donovan makes it clear that, when analyzing Allen's recollection of the event, his prior mental history, and his present mental state, there was nothing to suggest that Allen was mentally impaired at the time of the incident.  These professional observations and analyses reveal Dr. Donovan's opinion regarding the extent of Allen's impairment during the incident; namely, that he was not likely impaired in any substantial manner.

Finally, Allen also claims that Dr. Blinder failed to render a sufficient opinion as to the extent, if any, that Allen's capacity was impaired because Dr. Blinder "merely conclude[d]" that "I could discern no psychiatric disability in this perplexed, moody, lonely man that would rise to the

11

threshold negating penal responsibility nor competence to proceed." Like Dr. Donovan's letter, though, Dr. Blinder did more than simply give an unqualified opinion. Rather, he also outlined Allen's psychiatric history and provided his observations from their meeting. He provided details, such as describing Allen's understanding of trial proceedings and the potential penalties he could face, as well as observations such as "no hallucinations or illusions," "normal limits," and "does not appear clinically depressed."

Based on the foregoing, and after reviewing and analyzing the reports in their entirety, we conclude that the Circuit Court did not abuse its discretion in denying Allen's Motion to Strike Examiners.

B. Voir Dire Issue

Allen maintains that the Circuit Court abused its discretion when it precluded the defense from examining potential jurors about possible race-based prejudice and denied the defense's request for additional peremptory challenges, arguing that "[b]y precluding the defense from examining these jurors regarding possible prejudices against the defendant or bias towards the prosecution, the defense was unable to challenge these jurors for cause, [and] consequently the court effectively forced defense counsel to use two peremptory challenges."

"Both the federal and the state constitutions require, as a basic protection of the individual in a criminal case, trial by an 'impartial jury.'" State v. Pokini, 55 Haw. 640, 641, 526 P.2d 94, 99 (1974) (footnotes omitted). HRS § 635-27 (1993) governs examination for cause, and states the following:

> Each party shall have the right, under the direction of the court, to examine a proposed juror as to the proposed juror's qualifications, interest, or bias that would affect the trial of the cause and as to any matter that might tend to affect the proposed juror's verdict. Each party may introduce competent evidence to show the disqualification, interest, or bias of any juror.

"Refusal of the trial court to make or permit sufficient inquiry into possible prejudices of prospective jurors may infringe these [parties'] constitutional rights," and "[t]he

circumstances of a particular case may create a necessity for questioning prospective jurors specifically about racial prejudice during voir dire." State v. Altergott, 57 Haw. 492, 495, 559 P.2d 728, 732 (1977) (internal citation omitted). On the other hand, the law is well established that the trial court is vested with the discretion to regulate *voir dire* examination "so as to keep the questioning by counsel within reasonable bounds and to confine it to assisting in the impaneling of an impartial jury." See id. at 499, 559 P.2d at 734; see also Haw. R. Penal P. 24. "[A]bsent abuse of [the trial court's] broad discretion, and a showing that the rights of the accused have been substantially prejudiced thereby, the trial judge's rulings as to the scope and content of voir dire will not be disturbed on appeal." Altergott, 57 Haw. at 499-500, 559 P.2d at 734.

Here, prior to the parties' voir dire, the Circuit Court gave instructions to the prospective jurors about treating everyone in trial "without bias, prejudice or favoritism" on various grounds, including race and sexual orientation; the court asked whether anyone could not follow these rules. Allen's counsel, however, wished to go much further than this general inquiry, instead stating: "I should be able to voir dire on whether or not this juror, this -- and for the record here this juror appears to be Hawaiian, part Hawaiian. And the victim in this case is Hawaiian." The Circuit Court acknowledged Allen's objection, but nevertheless limited his inquiry, stating that "you can ask general questions . . . [y]ou can get into it without particularizing it as to Mr. Allen or the juror." The court then stated: "Counsel, the court's given an instruction earlier that everyone must be treated without bias, prejudice or favoritism on the grounds of race, sexual orientation, gender, religion, and you can inquire into that if you wish. But other than that, let's move on." Thus, the Circuit Court did not actually preclude the defense from examining potential jurors about possible race-based prejudice; rather, it simply limited the inquiry to that of a general nature and precluded the defense

13

from particularizing the racial differences between either Allen, Namauu, or the juror.

The Circuit Court's decision to limit the inquiry is in line with the Shabazz case, in which this court stated, *inter alia*, "[H]ighlighting racial differences, just because 'the evidence will show that[,]' lacks legitimate justification in the complete absence of relevance to the proof at trial. . . . That argument could be made for any racial reference, and any number of such references in a trial." State v. Shabazz, 98 Hawai'i 358, 379, 48 P.3d 605, 626 (App. 2002) (citing State v. Rogan, 91 Hawai'i 405, 414, 984 P.2d 1231, 1240 (1999)). In the present case, Allen was not charged with a crime involving race, race was not raised as part of his defense, and there is no indication in the record that racial bias was an issue in the case. Thus, the Circuit Court's decision to limit the inquiry was proper. See Shabazz, 98 Hawai'i at 379, 48 P.3d at 626; see also Altergott, 57 Haw. at 494-96, 559 P.2d at 731-32.

The Hawai'i Supreme Court's decision in the Altergott case further supports the Circuit Court's exercise of its discretion to limit voir dire under these circumstances. The supreme court explained that "[v]oir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." Altergott, 57 Haw. at 496, 559 P.2d at 732 (internal quotations omitted). The court made clear that there exists no "per se rule that [requires] voir dire on racial prejudice in any case involving a crime of violence where the defendant was of a different race than the victim"; rather, the right to "examine into specific possible prejudices on voir dire" exists only where there is a "constitutionally significant likelihood" that the jurors will be prejudiced. See Altergott, 57 Haw. at 497, 559 P.2d at 732-33. In the present case, the record contains nothing to show that the prospective jurors were racially prejudiced against Allen, and the defense offers none. Therefore, the Circuit Court's allowance of only generalized inquiries regarding race was constitutionally sufficient, and the

Circuit Court did not abuse its discretion in limiting voir dire on the subject.

Similarly, the Circuit Court also did not abuse its discretion in denying Allen's request for additional peremptory challenges.[6] In addition to the high threshold for meeting abuse of discretion for voir dire, once again, the record is silent as to any discernible prejudice or bias in either of the two jurors that Allen claims he was "effectively forced" to challenge. See Altergott, 57 Haw. at 496-97, 559 P.2d at 732-33. Accordingly, we conclude that the Circuit Court did not abuse its discretion in limiting Allen's examination of potential jurors regarding racial prejudice, nor did it abuse its discretion in denying Allen's request for additional peremptory challenges.

C.    The Medical Examiner's Testimony

Allen also contends that the Circuit Court abused its discretion by allowing Dr. Goodhue to testify as an expert regarding some of Namauu's wounds being consistent with "defensive wounds" because Dr. Goodhue was not a certified forensic pathologist. Hawai'i Rules of Evidence (**HRE**) Rule 702 governs the testimony of experts, stating:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

HRS § 626-1 (1993); see also Neilsen v. Am. Honda Motor Co., 92 Hawai'i 180, 188, 989 P.2d 264, 272 (App. 1999) (citation omitted) ("[A] witness may qualify as an expert if he or she possesses a background in any one of the five areas listed under HRE Rule 702: knowledge, skill, experience, training or education."). Furthermore, the Hawai'i Supreme Court has noted:

---

[6]    The right to peremptory challenges for criminal cases in Hawai'i is primarily governed by HRS § 635-30 (1993), which states (in relevant part) that "[i]n . . . criminal trials by jury each side is entitled to three peremptory challenges."

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, . . . but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. . . . Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

State v. Toyomura, 80 Hawai'i 8, 26 n.19, 904 P.2d 893, 911 n.19 (1995) (footnote and citations omitted).

We conclude that the Circuit Court was well within its discretion, as Dr. Goodhue demonstrated that he possessed extensive knowledge, skill, experience, training, and education in the field of forensic pathology. Dr. Goodhue testified that he: 1) was the Acting Chief Medical Examiner of the City and County of Honolulu; 2) has been licenced to practice medicine in Hawai'i since 1972; 3) earned his medical degree from Cornell University; 4) did his residency in anatomic pathology at the New York Hospital Cornell Medical Center; and 5) was board certified in anatomic pathology (of which forensic pathology is a sub-speciality) by the American Board of Pathology. Additionally, Dr. Goodhue explained that he had conducted approximately 1,600 forensic autopsies and had previously been qualified to testify as a medical expert in forensic pathology in the Hawai'i state courts on about 80 previous occasions over the past eight and a half years. Dr. Goodhue maintained his knowledge and skill in this area by "attending at least one annual, usually weeklong, meeting in the area of forensic pathology held by the National Association of Medical Examiners" and other similar agencies. Thus, despite Allen's claims otherwise, Dr. Goodhue demonstrated sufficient qualifications to testify as an expert in the field of forensic pathology, especially in light of Hawai'i's high deference to the trial court in these matters. See, e.g., State v. Torres, 60 Haw. 271, 277, 589 P.2d 83, 87 (1978).

Allen further contends that Dr. Goodhue offered no "testimony or evidence" about his particular expertise "regarding identifying defensive wounds." This argument is without merit.

Allen cites no authority in support of this argument and gives no reason as to why Dr. Goodhue's training and experience would not include identifying defensive wounds. While Hawaiʻi courts have not addressed the particular question in this case, experts in our courts have been allowed to testify as to specific matters falling under the scope of their expertise. See, e.g., Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 305, 640 P.2d 286, 289 (1982) (noting that "[a]lthough [the proffered expert] has no experience in the manufacturing or design of champagne, champagne bottles, or stoppers, the subject matter of the case falls within his overall background"); Torres, 60 Haw. at 277-78, 589 P.2d at 87-88 (forensic pathologist provided sufficient testimony as to his expertise in the general areas of x-ray photography and ballistics; therefore, his opinion regarding the caliber of the bullet was within the scope of his expertise).

Here, Dr. Goodhue's uncontroverted testimony was that forensic pathology is "the study by laboratory methods of bodily illnesses and injuries as these pertain to the law," and "what this means is that forensic pathology principally involves itself with [conducting autopsies]." The purpose of these autopsies is "to come to a conclusion about the cause of death and the manner of death." In knife deaths, one important type of evidence of the death's homicidal character is the presence of defensive wounds, which occur when the decedent is trying to "ward off the knife." Thus, because defensive wounds relate to discovering the cause and manner of death, which is within the realm of forensic pathology, the matter falls within the scope of Dr. Goodhue's expertise. The Circuit Court did not abuse its discretion in allowing Dr. Goodhue to testify as a forensic pathologist and to address the topic of "defensive wounds."

D. The Challenged Jury Instruction

Allen argues that the Circuit Court erred when it gave the jury the HAWJIC self-defense instruction, stating in relevant part:

> The use of deadly force upon or toward another person is justified when a person using such force reasonably believed that deadly force is immediately necessary to protect himself on the present

occasion against death, serious bodily injury or kidnapping. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position under the circumstances of which the defendant was aware or as the defendant reasonably believed them to be.

Allen argues that the instruction should have, instead, tracked the pertinent language of HRS § 703-304, which provides:

(1) Subject to the provisions of this section and of section 703-308, the use of force upon or toward another person is justifiable when the actor believes that such force is *immediately necessary* for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

Specifically, Allen argues that the inclusion of the term "immediately necessary" in the jury instruction, as opposed to "necessary," as it relates to the use of deadly force, was erroneous, especially in light of the fact that the "court did not instruct the jury on the definition of 'immediately necessary.'"

We disagree. A fair reading of HRS § 703-304 and its commentary reveals no indication that the Circuit Court in this case erred when it used the words "immediately necessary" in its self-defense instruction. Allen cites no caselaw or other authority in support of the assertion that the instruction was in fact erroneous.

"The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Kassebeer, 118 Hawai'i 493, 504, 193 P.3d 409, 420 (2008) (citation and internal quotation marks omitted). In the present case, even assuming *arguendo* that the instruction was erroneous, there is no indication that the instruction was prejudicially erroneous; in other words, "considering the record as a whole, there is [no] reasonable possibility that the error contributed to the defendant's conviction." See Kassebeer, 118 Hawai'i at

504, 193 P.3d at 420; State v. Nichols, 111 Hawai'i 327, 329, 141 P.3d 974, 976 (2006). Given Allen's assertion of the facts – namely, that he was stuck in the seatbelt with Namauu hitting him – it would make little difference to the jury whether his self-defense argument was based on "necessary" as opposed to "immediately necessary" action because either way the harm was contemporaneous with Allen's alleged need to neutralize Namauu. Therefore, we conclude that the Circuit Court properly instructed the jury regarding self-defense; however, even if it did not, the instructions were not prejudicially erroneous under the circumstances of this case.

E.    Alleged Prosecutorial Misconduct

There are three factors to consider when evaluating prosecutorial misconduct:  (1) the nature of the conduct; (2) the promptness of a curative instruction, if any; and (3) the strength or weakness of the evidence against the defendant. Rogan, 91 Hawai'i at 412, 984 P.2d at 1238; State v. Mars, 116 Hawai'i 125, 141-42, 170 P.3d 861, 877-78 (App. 2007).

Allen asserts that the State committed prosecutorial misconduct and violated his substantial rights when the prosecutor:  (1) made references which were intended to inflame the passions of the jurors and prejudice them against him; (2) made egregious misstatements of the law during closing argument; (3) referenced Bargas's opinion that Allen was not acting in self-defense; and (4) suggested that Allen had lied and tailored his testimony based on his review of the discovery materials and testimony at trial.  We will address each contention in turn.

We first consider Allen's argument that the State committed prosecutorial misconduct when, in closing argument, the prosecutor referred to Jesus, God, the Bible, compassion, and the parable of the Good Samaritan.  Allen's argument is that, in doing so, the prosecution was attempting to prejudice the jurors against him.  However, a careful reading of this portion of the State's closing argument demonstrates that the prosecutor was trying to use this well-known story, albeit Biblically-based, to make the point that the jurors should *not* be prejudice for or

against Allen or the other witnesses because of age, sexual-orientation, life style, or poor English-speaking skills. The references to the story of the Good Samaritan were clearly intended to urge the jurors not to base their fact-finding on such potential prejudices. There is not even the slightest hint that this arguably religion-based reference, which the judge allowed only as a literary or historical reference, would tend to favor one side or the other in the prosecutor's plea to set aside all prejudice and only consider the evidence objectively.

Allen also alleges prosecutorial misconduct based upon the prosecutor "continuously" arguing that Allen was a liar, as well as the prosecutor showing two slides that called Allen "a liar five separate times."[7] However, "[w]here the evidence presents two conflicting versions of the same events, a party may reasonably infer, and thus, argue, that the other side is lying." State v. Clark, 83 Hawai'i 289, 304-05, 926 P.2d 194, 209-10 (1996). Moreover, the Hawai'i Supreme Court has also held that "when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness," and that, thus, it was not improper for the prosecutor in that case to comment that "because [the defendant] had the highest stake in the outcome of the case, he had the greatest motive to lie." State v. Apilando, 79 Hawai'i 128, 142, 900 P.2d 135, 149 (1995). The State's actions in this regard were not improper. The State's remarks simply reference the conflicting testimonies and evidence at trial, inferring that Allen is lying, which is permitted by Clark. Additionally, as was permitted in Apilando, the prosecutor here pointed out that, in addition to the story not making sense, Allen also has the greatest motive to lie in the case. Thus, we reject Allen's first ground for asserting prosecutorial misconduct.

---

[7] Although there was reference made to the PowerPoint slides being made part of the record, Allen fails to cite to any part of the record that would lead this court to a copy of the disputed slides, and an independent examination of the record did not uncover them.

Allen next claims prosecutorial misconduct on the basis that, "during rebuttal closing, the prosecutor made egregious misstatements of the law, arguing to the jury that they could find [Allen] guilty if they believed that [he] [wa]s most likely guilty." However, the prosecutor never actually made any such statement. The statement the prosecutor made, as he discussed the burden of proof, was the following:

> The instructions read [to the jury] that you must find the defendant -- you must not find the defendant guilty upon mere suspicion or upon evidence which only shows that he is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but *proof beyond a reasonable doubt. There is nothing about most likely guilty.* But he would like you to believe that.

It appears that the State merely asked the jury to find Allen guilty based on proof beyond a reasonable doubt, subsequently telling them that they may *not* find Allen guilty based on "most likely guilty." Thus, Allen's argument on this point is without merit.

Allen also argues that the State committed prosecutorial misconduct when it presented a PowerPoint slide "which referred to Bargas' opinion that [Allen] was not acting in self-defense," stating that "Bargas'[s] bald assertion . . . is an improper legal conclusion by an unqualified lay witness."[8] In support of his contention, Allen cites HRE Rule 701, which states:

---

[8] Allen's claim regarding Bargas's opinion that Allen was not acting in self-defense appears to stem from a juror question asked at the conclusion of Bargas's testimony:

> THE COURT: Once you got to the car, did you ever see or did it appear to you that Mr. Allen was defending himself from the passenger?
>
> [Bargas:] Well, that depends on each person's perspective. From my opinion, it didn't look like he was defending himself because it's like he's hitting down on someone. To me that's like they have the advantage hitting down. But that's just my opinion.
>
> THE COURT: Okay. So you didn't see Mr. Allen defending himself, or you did?
>
> [Bargas:] He didn't do any defensive moves. Like to me defense is like blocking with your hands if someone is attacking you. So I didn't see that.

21

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited to
> those opinions or inferences which are (1) rationally based on the
> perception of the witness, and (2) helpful to a clear
> understanding of the witness' testimony or the determination of a
> fact in issue.

However, Allen does not explain how Bargas's testimony violates this rule or how it constituted an abuse of discretion for the Circuit Court to admit it. An examination of Bargas's testimony reveals that it complies with HRE 701. Bargas's comment that "it didn't look like he was defending himself" is rationally based on Bargas's perception of events because he based his conclusion on the fact that Allen appeared to be "hitting down on someone[,]" which, in his opinion, suggested that Allen had the "advantage" over Namauu. In addition, he stated that Allen "didn't do any defensive moves" (such as blocking with his hands), did not make any effort to leave his car or ask for help, and that Namauu was kicking up towards Allen with his arms and feet "wildly flailing." All of these assertions reveal that Bargas's opinion was rationally based on his perception of the incident.

The second element of HRE 701 is also met because Bargas's opinion was helpful to the jury's determination concerning Allen's claim of self-defense. Additionally, rather than constituting a "legal conclusion," the statement "defending himself" in the present context refers to what Bargas personally saw and perceived. See generally State v. Post, 512 N.W.2d 99, 102 (Minn. 1994) (showing that in Minnesota, which has evidentiary rules quite similar to those in Hawai'i, the Minnesota Supreme Court found that "[t]he word 'defending,' as used in the prosecutor's question [regarding a stabbing victim defending against an attack], was used in the sense that a lay person would use it, not to elicit a legal opinion but merely to elicit testimony as to what the witness saw"). Thus, as we have concluded that Bargas's testimony was properly admitted, we further conclude that the State did not commit prosecutorial misconduct by referencing it in closing argument.

Finally, we consider Allen's contention of prosecutorial misconduct based on the State's alleged suggestion that Allen had and tailored his testimony based on his review of the discovery and trial testimony.

Under Article I, Section 14 of Hawai'i's Constitution, a defendant has the right "to be confronted with the witnesses against the accused . . . ." Haw. Const. art. I, § 14.  In <u>State v. Mattson</u>, 122 Hawai'i 312, 226 P.3d 482 (2010), the Hawai'i Supreme Court, adopting the dissent in <u>Portuondo v. Agard</u>, 529 U.S. 61 (2000), recognized that generic accusations that the defendant has tailored his or her testimony based only on the defendant's presence at trial interferes with this right, holding that such comments "burden the defendant's constitutional right to be present at trial and could discourage a defendant from exercising his constitutional right to testify on his own behalf."  <u>Mattson</u>, 122 Hawai'i at 326, 226 P.3d at 496.  In this vein, generic tailoring comments occur when the prosecutor uses "the mere fact of a defendant's presence at his trial as the basis for impugning his credibility."  <u>Portuondo v. Agard</u>, 529 U.S. 61, 78 (2000) (Ginsburg, J., dissenting); <u>see also</u> <u>State v. Walsh</u>, 125 Hawai'i 271, 279, 260 P.3d 350, 358 (2011).

In <u>Mattson</u>, however, the supreme court stopped short of holding all tailoring accusations impermissible.  Turning to the facts of <u>Mattson</u>, the court recounted the prosecutor's allegedly impermissible comments:

> *He told you he lied before.*  He had a chance to sit through the evidence.  He had to make his story gibe with what you've heard.  What is in evidence.  What [Kumia] even had to admit to, because she— . . . .  He sat through the evidence.  There is a 911 tape.  [Kumia's] statement.  [Hayashi's] statement.  *Based on all that, he is not telling the truth.  All of a sudden he remembered that he grabbed that knife.*
> This case is about credibility.  In order to believe the defendant, you have to be able to answer why didn't [Kumia] just give him the key?  Why did [Kumia] lock him out of the house that night?  Why lie the day after the event?

<u>Mattson</u>, 122 Hawai'i at 326-27, 226 P.3d at 496-97.  The court then acknowledged that the prosecutor:  (1) drew attention to the defendant's presence throughout trial; and (2) made an accusation that he had tailored his testimony to the evidence presented.

Id. at 327, 226 P.3d at 497. However, the court held that the defendant's constitutional rights were not violated because "the prosecution referred to specific evidence presented at trial *in addition* to referring to [the defendant's] presence at trial." Id. This reasoning echoed the court's opinion in Walsh, where it explained that "[t]he prosecutor may permissibly cast doubt about the substance of a defendant's testimony by referring to specific evidence suggesting that the defendant engaged in tailoring . . . [h]owever, the prosecutor cannot ask the jury to infer the defendant's lack of credibility from the manner in which he presented his testimony." See Walsh, 125 Hawai'i at 292, 260 P.3d at 371 (internal citation and quotation marks omitted).

In the present case, Allen refers to several instances in which the prosecutor allegedly suggested that Allen tailored his testimony, though in none of these instances did the prosecutor explicitly assert tailoring. We recognize, nevertheless, that the suggestion may be made implicitly, and that there are no "specific words or phrases" indicative of an accusation of tailoring; rather, the accusation may be implied. See Walsh, 125 Hawai'i at 285, 260 P.3d at 364.

Allen's first contention regarding tailoring is that it was improper for the prosecutor to state the following, in his closing argument: "Who has the most information before they testify and are they willing to use that information to their benefit," and who has the "[i]nterest in the result of the case." However, the context of these comments reveals that the prosecutor here was not referring (or drawing attention) "to the defendant's presence" at trial, but rather was simply explaining to the jury generally how to "determine the credibility of someone you don't know" by referring to the jury instructions and clarifying them. Furthermore, nothing in that context (explaining jury instructions and credibility generally) indicates or suggests (explicitly or implicitly) that Allen was tailoring his testimony. Therefore, the two Mattson factors (drawing "attention" to the defendant's presence and accusing the defendant of "tailoring") are not present, and the prosecutor's

statements here were not improper, as they were removed from any "tailoring" context or implication.

Allen also asserts that the prosecutor's characterization of his testimony as "convenient" was an improper suggestion of defendant tailoring, referring to the following statement by the prosecutor:

> And maybe [Allen] was upset about -- maybe he was upset about the drug use, maybe he was upset that she didn't have any drugs for him. I don't know. We don't know what he was upset about. All we have is his testimony, his *convenient* testimony, about why he got upset, because he was being – maybe he thought he was being robbed for $250 or maybe he thought his eyes were going to be poked out.

(Emphasis added). Although the State's comments here clearly made reference to Allen, they did not draw attention to his *presence at trial* or accuse him of tailoring his testimony. Moreover, the State's comments were not improper because they "referred to specific evidence adduced at trial" that was related to Allen's testimony. See Mattson, 122 Hawai'i at 327, 226 P.3d at 497; see also Walsh, 125 Hawai'i at 281, 260 P.3d at 360. For instance, the State referred to Allen's allegations that Namauu was supposedly using drugs and attacking him. Accordingly, the State's comment that Allen's testimony was "convenient" was not an improper tailoring argument by the State.

Finally, Allen argues that the prosecutor improperly suggested tailoring when he portrayed Allen as a liar because he "has no other reason not to lie." However, as in the other instances alleged by Allen, the context here reveals that no improper tailoring occurred. Granted, the State drew attention to Allen's presence at trial because it stated that "he has lied to you today" (referring to Allen's actual testimony) and that suggested "[i]f I tell the truth, get convicted. . . . [i]f I lie, maybe I get off" (referring to Allen's supposed mindset in testifying). While this attacks Allen's motivation and credibility, it is not even an implied accusation that Allen tailored his testimony to the evidence presented. The prosecutor is simply arguing to the jury that Allen had lied in his testimony, not based on the fact that he tailored his testimony,

but rather based on "common sense, combined with the evidence" against him, which, being substantial, would give him a motive to lie.

Accordingly, we reject Allen's argument that he is entitled to a new trial based on prosecutorial misconduct.

V.    CONCLUSION

For these reasons, the Circuit Court's January 27, 2010, Judgment of Conviction and Sentence for Murder in the Second Degree is affirmed

DATED: Honolulu, Hawaiʻi, October 31, 2013.

On the briefs:

Te-Hina Ickes
for Defendant-Appellant

Stephen K. Tsushima
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge